UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------X
MARY COLLETTA, R.N.

                Plaintiff,

   -against-                         CV

NORTHWELL  HEALTH; PECONIC         VERIFIED COMPLAINT AND
BAY  MEDICAL CENTER;  ANDREW     JURY DEMANDED
MITCHELL  as CEO/PRESIDENT,
PECONICBAY MEDICAL CENTER,
and Individually; STEPHANIE RUSSO,
as Associate Executive Director of
Perioperative Services, NORTHWELL
HEALTH  and Individually;  MONICA
CHESTNUT RAULS,  as Vice President
Human Resources, PECONIC BAY MEDICAL
CENTER,  and Individually; MELISSA TRUCE,
Labor Management Relations NORTHWELL
HEALTH and Individually; FROBEL CHUGATA,
Regional Director,  NEW YORK STATE
DIVISION OF HUMAN RIGHTS, In His
Individual Capacity;  NEW YORK STATE
NURSES  ASSOCIATION. LOCAL     ;
and  VLADIMIRE SHERMAN, as a NEW
YORK STATE NURSES ASSOCIATION
PROGRAM REPRESENTATIVE  and Individually,


                Defendants.
-------------------------------------------------------X

      The Plaintiff, MARY COLLETTA, by  and through her counsel, HARRIET A.

GILLIAM,  ESQ. complaining of the defendants, alleges as follows:

### NATURE OF ACTION

    1.   Northwell Health and Peconic Bay Medical Center  formerly known as Peconic Bay

Medical Center and Central Suffolk Hospital ( hereinafter referred to as "Northwell" or

"Hospital"   purports to be an equal opportunity employer, but has openly targeted Plaintiff,

1

Mary Coletta , as an older and disabled staff member, and subjected her to bullying and harassment, as well as unwarranted discipline based upon false accusations, constant threats, adverse employment actions and and more onerous working conditions than her younger co-workers, all at the direction or direct involvement of Plaintiff's supervisor, Defendant Stephanie Russo.

The defendant hospital has further engaged in a pattern of discriminatory and retaliatory conduct against Plaintiff due to her documented ADA disability, her age  and  for retaliation, as a result of her protected activity  of reporting dangerous conditions and practices in the hospital, and in the operating room in particular, which directly compromised the safety and wellbeing of the patients in the operating room.  The  defendant hospital has also harassed and discriminated against Plaintiff for taking leave under the FMLA and for requesting an accommodation under the  ADA.

This civil  action is brought to address and redress Plaintiff's injuries.  Plaintiff is seeking monetary relief (including past and ongoing economic loss) , declaratory judgment, compensatory and punitive damages , disbursements, costs, and fees for violations of the Plaintiff's rights, under Title VII of the Civil Rights Act of 1964, as amended ,  42 U.S.C. Section 2000e,  et seq., the Age Discrimination in Employment Act (ADEA) , 29 U.S.C. Section 623, et seq.,  the Americans with Disability Act (ADA) , 42 U.S.C. Section 12101, et seq.;   the Family Medical Leave Act;  (FMLA) 29 U.S.C. Section 2601, et seq.; the Labor Management Relations Act, (LMRA)  Section 301 , 29 U.S.C. Section 18;  the Fourteenth Amendment to the United States Constitution pursuant to  Section 1983; New York State Labor Law, Section 741; negligent infliction of emotional distress;  and intentional infliction of emotional distress.

2

## THE PARTIES

2.   Plaintiff, MARY COLLETTA, ( hereinafter referred to as "Plaintiff" or "Ms. Colletta" is a 61 year olf  resident of the Town of Riverhead, County  of Suffolk, State of New York.

3.    At all times relevant herein, Plaintiff, MARY COLLETTA,  has been employed as a Licensed Professional Registered Nurse by Defendant Peconic Bay Medical Center  (PBMC) , f/k/a Central Suffolk Hospital, now known as Defendant Northwell Hospital, from November 5, 2007  until the present time.

4.   At all relevant times herein, Plaintiff was an "employee" within the meaning of the aforementioned statutes.

5.   At all relevant times herein, Plaintiff was a member of the collective bargaining unit  of the defendant  union , New York State Nurses Association, and subject to the terms of the collective bargaining agreement between PBMC  and NYSNA.

6.   Upon information and belief, Northwell  Health is a duly organized corporation existing under and by virtue of the laws of the State of New York, and is presently doing business in the State of New York, with a location at 1300 Roanoke Avenue, Riverhead, New York, as a healthcare facility open to the public.

7.   Upon information and belief, PBMC  is a duly organized corporation existing under and by virtue of the laws of the State of New York and is presently doing business in the State of New York, with a location at 1300 Roanoke Avenue, Riverhead, New York, as a healthcare facility open to the public and  is now owned, operated, managed, controlled or maintained by Northwell Health.

3

8.  Defendant Northwell Health is an "employer" for purposes of Title VII, 42 U.S.C. Section 2000(e)  et seq., and the aforementioned statutes, and upon information and belief, employs in excess of 500 people.

9.  Defendant PBMC  is an "employer"  for purposes of Title VII, 42 U.S. C.  Section 2000(e) et seq. and the aforementioned statures, and upon information and belief, employs in excess of 500 people.

10.  Defendant Andrew Mitchell is the CEO/President  of PBMC and is responsible for implementation  of and adherence to all hospital policies, procedures and statutory and regulatory requirements and the day to day operations of PBMC,  and is named in his individual and official capacities.

11.  Defendant Stephanie  Russo  is the Executive Director of Perioperative Surgical Services for  Defendant Northwell/PBMC and is named in her individual and official capacities.

12.  Defendant Monica Chestnut Rauls is the Vice President for Human Resources for PBMC  and is named in her individual and official capacities.

13.  Defendant Melissa Truce is a Labor Relations Manager for Northwell Health  and is named in her official and individual capacities.

14.  Defendant Froebel Chugata  is the Regional Director for the New York State Division of Human Rights , Long Island Regional Office, and is named in his individual capacity,

15.  Defendant NYSNA  is a collective bargaining organization, existing under the laws of the State of New York, and is the duly recognized collective bargaining organization

4

for nursing staff at PBMC, of which Plaintiff is a member, and is a party to a collective

bargaining agreement with PBMC  on behalf of the nursing bargaining unit.

16.  Defendant Vladimir  Sherman  is an NYSNA  Program Representative

and is named in his official and individual capacities.


## JURISDICTION AND VENUE

17.  This Court has subject matter jurisdiction pursuant to 28 U.S.C. Section 1331,

and 28 U.S.C. 1367, and principles of pendent jurisdiction in that the state and federal law

claims arise from a common nucleus of operative facts.

18.  Plaintiff, MARY COLLETTA,  filed a charge of discrimination with the United

States Equal Employment Commission (hereinafter referred to as "EEOC" )  on or about

December 16, 2016 .

19.  On or about  August 14, 2017  the EEOC issued to Plaintiff, MARY

COLLETTA,   a  Notice of Right to Sue Letter.

20.  Plaintiff has complied with all prerequisites to jurisdiction in this Court.

21.  As the unlawful employment practices and other actions complained of herein

occurred within the jurisdictional limits of this Court, venue is proper in this District under

28 U.S.C. Section 1391.


## FACTS AND ALLEGATIONS COMMON TO ALL COUNTS

22.  Plaintiff began working at PBMC,  f/k/a Central Suffolk Hospital on  November 5,

2007 as a staff  nurse in the operating room .   In her role as a staff nurse, Plaintiff actually

had all the responsibilities and duties as a charge nurse from 2010 through 2013.   Because of

her skill, expertise , advanced leadership  skills  and consistent excellent job performance,

Plaintiff was promoted to the Charge Nurse position of the operating room, (PBMC)

23.  Plaintiff's charge nurse position was a bargaining unit position , without  regular

patient assignment and is covered under the collective bargaining agreement between defendants

PBMC  and NYSNA.

24.  At all times relevant herein, Plaintiff was an exemplary employee and because of her

skill and experience, she had been selected by the OB/GYN medical staff to be the "on call"

nurse, for rapid response.  This administrative decision was made in accordance with the

recommended guidelines, according to the ACOG , the American College of Obstetricians and

Gynecologists. advocating for quality women's health care and the highest standards of

clinical practices and was approved by the hospital's Operating Room Committee.  Plaintiff

was dedicated and committed to this goal of patient safety and the highest standard of clinical

practices for high acuity emergency obstetrical patients.

25.  Plaintiff was the primary nurse covering emergency "on call" for the Obstetrical

Department,   where her duties were to assist OB/GYN  doctors , as circulating

nurse,  and occasionally as scrub nurse.

26.  For approximately eight years, on a consistent and regular basis, Plaintiff

maintained the position as "on call" nurse for OB/GYN , with a regular set schedule for

Obstetrical call, and her position was salaried under the payroll for Obstetrics. Consistently.

Plaintiff worked the same schedule.

27.  In her capacity as Operating Room Charge Nurse,  Plaintiff was responsible for the

coordination of unit operations and  continuous quality improvement during the course of a

specific shift, (0700-1500), plus overtime.   One of Plaintiff's primary roles was that of patient

6

advocate for surgical patients and for striving to maintain excellence in patient care and safety.

As charge nurse, Plaintiff also served as a resource person for the unit and for nursing staff, operating team unit ,ancillary staff and medical staff.   As a  resource person, Plaintiff contributed to and fostered a positive working environment that enable staff to model professionalism, collaboration, teamwork and open communications.

Plaintiff's essential job functions as Operating Room Charge Nurse, included the following:

a) Ensure  hospital policies and procedures are followed and to report any incident or acts and or omissions which may violate hospital policy, as well as reporting to any incident which may reasonably present or is a significant threat to surgical patient safety, and to ensure that evidence based care measures are followed;

b) Demonstrate effective clinical leadership skill and collaboration of teamwork;

c) Coordinate, direct, assess and modify appropriate staff assignments and operating room assignments to reflect the acuity of patients, changes in surgical volume and skill level of staff;

d) Monitor and assist in discharge, transfer and admission of patients to ensure timely transfer  of patients;

e) Communicate with management, supervisors and administration to ensure appropriate patient assignment according to changes in acuity and/or surgical patient volume;

f) Demonstrate strong communication skills and successful conflict resolution for minor conflicts with patients, families and other members of the heath care team;

g) Participate in leadership rounds with newly admitted patients;

h) Monitor /facilitate hourly rounding by all staff on the unit;

i) Facilitate and coordinate break and mealtime relief;

j) Perform daily environmental safety rounds and ensure that temperature and humidity levels are documented, also perform daily check of emergency crash carts, defibrillator, and fire extinguishers;

7

k) Evaluate the condition of available equipment and assess the needs of special equipment necessary for surgery, instrumentation, supplies;

l) Ensure that surroundings are kept safe and clean;

m) Work in coordination with biomedical engineering for repair, maintenance of equipment, as well as for quality initiatives on new equipment brought in to the operating room;

n) Coordinate with vendors, central service processing and material and supplies staff to ensure that surgeons had instrumentation as well as any specialty items that they need or may need for surgery;

o) Work with plant operations for repairs, maintenance of operating room equipment and issues of temperature or humidity in the surgical environment;

p) Promote , advocate for and strive for excellence in care and patient safety;

q) Ensure that surgeons have everything they need or may need for surgery and help to maintain and promote relations with surgeon;

r) Coordinate interdepartmental flow of patient information;

s) Work with Booking Office for coordination of special requests on booking sheets to ensure that special requests get to the appropriate area;

t) Bring to the attention of the Director of Periop Surgical Services any acts, omissions affecting quality of patient care or patient safety issues, and areas of concern with surgical staff competencies or non-compliance with hospital policy or procedure;

u) Identify any issues with Pre-Surgical Testing that might affect OR schedule efficiency;

v) Trouble –shoot all operating room equipment, computer systems, including speciality items and instrumentation for surgery, robotics, neurosurgical spines, orthopedic, ENT, laser coordinator, endovascular, bariatric, GYN/OB and assist/ educate OR Team Members, as needed intraoperatively.

28. Up until January 16, 2017, Plaintiff had never received a negative personnel action or a negative evaluation.

29. Plaintiff has received numerous letters of appreciation from operating room doctors, attesting to her skill and proficiency in the Operating Room and her ability to be a coordinator of

efforts and a team player.

30.  Plaintiff has always viewed her role in the OR as protecting the rights and health of patients and ensuring that the OR ran safely and efficiently.

31. Upon Defendant Russo's arrival to the hospital in May, 2016, Defendant Russo began taking actions that pointed to her targeting older staff of PBMC in the OR and taking actions that treated older employees less favorably than younger staff , resulting in a high turnover in older staff.

32.  The actions of Defendant Russo in May, 2016 resulted in there being low staff morale and staff generally being upset with the change in work environment., all of which presented serious challenges to Plaintiff's ability to carry out her aforementioned duties and responsibilities as OR Charge Nurse.

33.  During May, 2016 and again on June 1, 2016, Plaintiff  encountered serious issues with the transitioning of upper-management.  Plaintiff did her best to compensate for severely "upset" unit, staff morale at its lowest and some staff having performance problems and their own personal insecurities, feeling threatened by the arrival of Defendant Russo.

34.  It was out of her concern for patient safety and wellbeing that Plaintiff  brought to the attention of her supervisor, Defendant Russo, certain conditions or conduct which she had directly observed in the operating room or related to the operating room that she believed seriously compromised the safety and wellbeing of patients and compromised the safe and efficient function of the operating and hindered surgeons ability to perform surgery.  Plaintiff reported the following:

a ) Misappropriation of hospital funds due to over and under stocking of supplies, thereby resulting in additional expenses of last minute overnight shipping and handling and also jeopardizing being able to proceed with scheduled surgeries;

9

b) Unauthorized lending of hospital surgical trays to other medical institutions which created a shortage of said surgical trays in the OR and compromising the safety the patients.

c) Shortage of basic stock items and failure to restock, wound drains, blades, mesh, which again compromised patient health and safety

d)  Over 100 intra-ocular  implants expired and wasted ;

e) Keeping food in a refrigerator  designated for human bone and synthetic hemolytic agents

f)  Over-ordering and waste of human  bone and synthetic graft material

35.  These on-going conditions of which Plaintiff complained to Defendant Russo, created dangerous conditions for OR patients and compromised their safety and wellbeing.

36.  Within two  weeks of Plaintiff making these complaints to Defendant Russo, she was advised by Russo that she had been accused of bullying staff and that she was being summarily demoted without any  opportunity for her to be specifically advised of the nature of the complaints and without her being afforded an opportunity to respond

37. Defendant Russo failed to  follow the Hospital's policies and protocol, without good reason, which required that she conduct an open and good faith investigation and that she only proceed with the disciplinary demotion upon determining that there was a factual basis for the complaints.

38.  None of these procedures were followed before Defendant Russo took disciplinary action against Plaintiff  which materially altered her terms and conditions of employment .

39.  Plaintiff was never advised of the nature of the complaints and she was never afforded an opportunity to respond to the allegations.  Defendant Russo made a determination that Plaintiff was guilty, without any factual basis for her conclusion , thereby acting in violation of Hospital policy and the just cause provision of the Collective Bargaining

agreement between the Hospital and NYSNA,  in that there were no reasonable grounds

for her actions against Plaintiff.

40.  Based on these unsubstantiated allegations, and without even the benefit of an

investigation or an interview of Plaintiff,  Defendant Russo  removed Plaintiff from her position,

without just cause , all stemming from the complaints that Plaintiff had

made to Russo regarding dangerous conditions in the operating room or related to services

incident to the functioning of the operating room.

41.  Russo's actions in demoting Plaintiff were arbitrary and capricious given that there

were no witnesses to any of the alleged actions;  that there was no identification of date, place or

time of the supposed misconduct;  that the severity of the penalty outweighed the nature of the

alleged misconduct  which was not bullying of staff, but rather verbal reprimands for violation

of hospital policies and for engaging in misconduct which compromised patient health and

safety;  and given that Plaintiff had presented Russo with several letters of support from surgeons

and the fact that Plaintiff had never been the subject of any prior complaints or disciplinary

actions.

42.  Russo's actions of demoting Plaintiff resulted in there being a material change in

Plaintiff's duties  and terms and conditions of employment as follows:

a)   All of the responsibilities and job functions of charge nurse, as set forth in paragraph
   25 were taken from Plaintiff;
b)  Plaintiff  had a substantial cut in her salary;
c)  Plaintiff was no longer permitted to answer the telephone or troubleshoot equipment
d)  Plaintiff was stripped of all privileges associated with the position of charge nurse;
e)  Plaintiff was made the subject of rumors and was subjected to  public ridicule in front
   of the OR staff , causing her great humiliation and distress.  Plaintiff was not even
   permitted to stand near the nurse's station.

43.  The extent of Russo's harassment of Plaintiff was so persistent and unrelenting

that it was regularly stated among staff that Russo was on a witch-hunt and that Plaintiff

was the witch being hunted.

44. After Plaintiff's informal request to Russo for reassignment to her regular shift

which remained vacant, Defendant Russo response was " Ain't happening" "It's my way or the

highway, out with the old" and " You are out, way out"

45. Plaintiff sought the assistance of her union delegate, Defendant Vladimir

Sherman, regarding PBMG/NORTHWELL's numerous  violations  of the collective bargaining

Agreement and hospital policies in connection with Russo's actions of demoting her and

materially altering the terms and condition of Plaintiff's employment.  .

46. Over a number of disciplinary labor management meetings,  from the date of

Plaintiff's demotion in July, as well as through August, 2016. Russo remained  steadfast in her

intent to find Plaintiff to have violated the Hospital's code of conduct policy by issuing written

counseling containing a narrative that included threatening Plaintiff's termination .

47. Defendants Russo, Chestnut Rauls and Truce articulated a false justification for

the Hospital's action of removing Plaintiff from her position as Charge Nurse, falsely arguing

that the position was not an "assignment" but a position" and that staff positions could be

changed without the notification of the Union.  However, there was no change in the charge

nurse positions for PACU  and Endo/Pain have remained intact:  Only Plaintiff's position was

changed to an assignment.

48. During a disciplinary meeting on July 7, 2016,with Defendant Russo, Plaintiff

experienced a medical emergency  as a result of the constant harassment and false

accusations, requiring her to immediately report to the Hospital's Emergency Room, where

she was diagnosed with "out of control" blood pressure and a severe stress reaction. Plaintiff

was sent home, unable to work.

49.  Plaintiff complained to the Defendant union, requesting that a grievance be filed based upon Russo having violated the just cause terms of the collective bargaining agreement by failing to conduct a  fair and full investigation before issuing Plaintiff the written warning. Plaintiff and Defendant Vladimir Sherman, NYSNA Program Representative made repeated requests of Defendant Russo for a full and objective investigation, to no avail.

50.  Defendant union filed five (5)  grievances on Plaintiff's behalf and Plaintiff was led to believe that the adjudication of the grievances was moving forward.

51.  It was not until July, 2017, that Plaintiff was advised by Defendant NYSNA that the union was no longer pursuing the grievances and that Defendant Russo, on behalf of PBMC/NORTHWELL,  had  managed to unilaterally terminate the union's grievance processes and had blocked any remedy or arbitration, and had deemed the matter closed, and had changed the written discipline to a verbal warning , knowing that the union does not arbitrate a verbal warning.  The verbal warning was placed in Plaintiff's personnel file.

52.  By  email communications, Plaintiff complained to NYSNA, as to why It did not pursue her grievances:  To date there has been no response.

53.  Over the course of the  months that Plaintiff was being disciplined and harassed by Defendant Russo Plaintiff  was complaining  to Defendants Chestnut Rauls and Truce about the discriminatory and unfair treatment of false allegations,  her demotion, her change in her hours of work and assigned duties, change in her title and  the constant berating of her by Russo.

54.  After complaining to Defendants Chestnut Rauls and Truce about the discriminatory

13

and retaliatory actions of Russo, Plaintiff was further retaliated against by Russo taking away her assignment to the OB/GYN  on call position and placing her on a rotation with other nurses who did not have the same level of experience and skill for the on call position.

55.  In making  this change in Plaintiff's assignment, Defendant Russo was acting outside the scope of her practice , as she did not oversee OB/GYN.  Moreover Russo's decision was retaliatory based upon the timing of the action and the fact that the other nurses who were now placed on rotation did not have the same level of experience and skill required for the OB/GYN  on call position and were younger than Plaintiff.

56.  Plaintiff was treated worse than younger nurses with less experience and seniority in terms of assignments, privileges, sick leave, overtime and preceptor opportunities.

57.  Plaintiff's duties and assignment as OR charge nurse were given to younger  staff who were favored by Defendant Russo.  As a result of Russo taking away Plaintiff's on call, Plaintiff experienced a loss of approximately Fifty Thousand Dollars.

58.  During the course of the months that Plaintiff was complaining of discriminatory treatment, she was further retaliated against by being falsely accused of abusing her sick leave and was issued a written warning on account of this accusation.

59.  Over a three month period of time, Plaintiff had six absentee occurrences,  all of which were while she was the treatment of a physician and she  had medical documentation substantiating her absences, which were presented to Defendants Russo and Chestnut Rauls. At no time did the Defendants Russo or Chestnut Rauls  ever advise  Plaintiff that she could use FMLA leave for her medical appointments:  Instead, she was falsely written up for violating the Hospital absences policy.

60.  Plaintiff contacted the ADA advocacy attorney and was advised that her medical

14

appointments qualified for FMLA leave with overlay ADA protection. At no time did the hospital administration advise Plaintiff of her rights under the FMLA, and that in light of her ongoing medical treatment or sick leave, the hospital was required to give Plaintiff FMLA leave, even if she didn't know to ask for it.

61. On several occasions when Plaintiff complained to Defendant Chestnut Rauls about Russo's treatment of her, Chestnut Rauls referred to her as an "old dog" who didn't want to learn new tricks.

62. Russo also referred to Plaintiff as "an old dog" and made statements about getting rid of old blood.

63. Plaintiff objected to the charge of excessive absenteeism and requested a meeting with hospital Defendant Chestnut Rauls of HR at which time, she was advised that the hospital in its discretion could deem her documented medical absences to be excessive, although other employees who took time off were not disciplined. The Hospital refused to include Plaintiff's FMLA eligible leave in the calculation of absences, in violation of its no fault policy.

64. The Hospital never told Plaintiff about her right to FMLA leave for treatment of her medical conditions, which it was required to do, even if Plaintiff did not know to ask for the leave.

65. On November 10, 2016 Plaintiff hand delivered and emailed Defendant Chestnut Rauls a formal notification to the Hospital that she was a qualified individual with a disability under the ADA definition of the second prong record of long-term generic cardiac condition, and that due to genetic characteristics she had a cardiac defibrillator implant, . Plaintiff further requested an ADA accommodation due to remission which substantially

15

limited more than one major life activities when active and which was being activated and

aggravated by the constant harassment she was experiencing from Defendant Russo, as well

unwarranted disciplinary actions taken by Russo and the material change in Plaintiff's terms and

and conditions of employment, which caused her severe stress.

66.  On November 11, 2016, Defendant Chestnut Rauls responded via email , setting up ,

per Plaintiff's request, an ADA meeting on November 17, 2016

67.  Plaintiff scheduled the meeting during her meal period at 12:15 on November 17,

2016 and it had been preapproved by the OR manager.

68.  On the morning of November 17, 2016, Defendant Russo advised Plaintiff that

"Due to the operational needs of the unit, I am changing the time of your HR meeting"  Plaintiff

tried to explain to Russo that her appointment time had been pre-approved by the OR manager

and was scheduled during her lunch.

69.  Defendant Russo responded :  "Absolutely not"  and moved Plaintiff's  HR, ADA

meeting with Defendant Chestnut Rauls to 4:00 p.m.  However, prior to the 4:00 p.m. meeting,

Russo directed Plaintiff to report to her office with a union representative for a disciplinary

meeting, which had not been previously scheduled and concerning which Plaintiff had not been

previously notified.

70.  At the disciplinary meeting, Russo accused Plaintiff of  cutting, or operating on

a patient, which Plaintiff vehemently denied. Russo continued to perpetuate this false

allegation all the way through the Hospital's response to Plaintiff's NYSDHR charge,

finally recanting it in June, 2017.

71.  Plaintiff then proceeded to her 4:00 meeting with Chestnut Rauls and rather

than discussing the documentation Plaintiff had submitted for an ADA accommodation,

16

Chestnut Rauls refused to engage in any ADA interactive process regarding Plaintiff's identified disability, but instead referred to Plaintiff as an "old dog" not willing to learn new tricks rather than discussing Plaintiff's request for an ADA accommodation, Chestnut Rauls gave Plaintiff forms to complete for an FMLA leave.

72. Plaintiff's email dated November 17, 2016 , following her Human Resources meeting with Defendant Chestnut Rauls evidenced that Plaintiff was confused regarding her rights under FMLA and that she had not been provided sufficient information relating to her FMLA rights, although Chestnut Rauls had sufficient information to reasonably determine that the FMLA applied to Plaintiff's absenteeism occurrences and that her need for FMLA leave was unforeseeable and qualified, thereby making the written disciplinary action dated November 28, 2016 for medical absences unnecessary.

73. The November 28, 2016 written discipline issued by Defendant Russo was also in violation of the Hospital's no-fault attendance policy, which was to consider emergency situations on an individual basis by the effected employee's department head, which in Plaintiff's case would have been Defendant Russo who, instead of following Hospital policy, issued an unwarranted written discipline to Plaintiff.

74. Plaintiff continued to observe a number of additional violations of hospital procedures and protocols which she reasonably believed compromised patient health and safety. Plaintiff documented her concerns in a letter dated December 1, 2016 to Defendant Mitchell, CEO/President of the hospital.

75. In her December 1, 2016 letter to Defendant Mitchell, Plaintiff brought Patient health and safety issues to his attention:

17

There was no response.

76. Shortly after her complaint to Defendant Mitchell, Plaintiff experienced the

following treatment:

a) Permanent change in her shift

b) Increase in working hours

c) assignment of heaviest caseload

d) being denied leave requests for medical appointments

77. On December 5, 2016 there was a meeting at which Defendant Russo refused to

discuss Plaintiff's complaints of harassment and discriminatory treatment. In response, Russo

told Plaintiff thank you for your years of service and your services are no longer needed.

Plaintiff advised the union and nothing was done.

78. Plaintiff continued to be harassed by Defendant Stephanie Russo on

a daily basis as follows: increased scrutiny, psychological harassment, rolling

her eyes at Plaintiff, taking away 100 hours of overtime, terminating union

grievances and blocking arbitration.

79. The harassing and hostile treatment of Plaintiff by Defendant Stephanie

adversely impacted Plaintiff's existing medical condition which had been able to work

under until now.

80. Plaintiff is diagnosed with stressed induce cardiomyopathy , labile HTN,

acute stress reaction and Post Traumatic Stress symptoms. But she was still able to work until

the onset of the harassment and unwarranted Disciplinary actions and changes in her work

18

schedule, assignment and conditions.

81.  During this same timeframe that Plaintiff was complaining about unsafe operating room conditions which compromised the health and safety of patients, she continued to be retaliated against, being issued a false performance evaluation by Defendant Russo.  Plaintiff submitted a rebuttal to the negative performance evaluation, contesting the statements in the evaluation and deeming them to be false and a form of harassment.

82. Defendant Hospital and its agents Stephanie  Russo and Monica Chestnut Rauls refused  to engage in the required interactive process and address Plaintiff's ADA claim, instead telling Plaintiff that she had to take leave under FMLA.

83.  Plaintiff filed a complaint with NYSDHR and the EEOC on December 19, 2016, alleging age discrimination,  disability discrimination and retaliation.

84.  On January 26, 2017 Defendant Russo issued Plaintiff a negative and false performance evaluation.  The evaluation was not due at that time because Plaintiff had already received a positive evaluation in December 2016 from her former supervisor and her anniversary date for the next evaluation was November, 2017.

85.  Plaintiff submitted a written rebuttal to the evaluation , contesting the the asserted factual bases for the negative evaluation.

86. Upon reviewing of her personnel file on or about March 10, 2017. Plaintiff learned that Defendant Russo had "papered" her file , with false allegations and without Plaintiff's knowledge, thereby precluding Plaintiff from having the opportunity to rebut the false allegations.

87.  While the NYDHR charge was pending, and after the Defendants PBMC/Northwell

19

acknowledged receipt and knowledge of Plaintiff's charge, Plaintiff began to experience the
the following retaliatory actions:

      a) Upon request for assistance with her heavy caseload, she was refused by then Charge Nurse, Maureen , who told her that Stephanie Russo is the boss and that she is doing what Stephanie tells her to do, concerning her treatment of Plaintiff;

      b) Plaintiff was denied leave requests to attend her weekly doctor's visits

      c) Russo accused Plaintiff of posing a threat to the patients and took away over 100 hours of overtime.

88.  As a result of the Defendants' refusal to accommodate Plaintiff, coupled with the continued harassment and retaliatory actions of Russo and Chestnut Rauls, Plaintiff's health deteriorated  resulted in her hospitalization on May 17, 2017 for a cardiac procedure.

89.  Plaintiff was cleared to return to work the end of May, 2017 with light duty. Plaintiff was on call that weekend  and was denied the opportunity to work.

90.  During the course of the  NYSDHR  investigation Defendant Regional Director showed favorable treatment to the Respondent Hospital, allowing them three extension for submitting a reply , a total of  141 days.  At the same time, Plaintiff's one request for a short extension of time to submit a rebuttal, due to her medical condition and hospitalization, was denied.

91.  On July 10, 2017, Plaintiff requested of the NYSDHR  a dismissal of her charge for administrative convenience since she had requested issuance of a Notice of Right to Sue Letter.

92.  The NYSDHR  investigator represented to Plaintiff by communications on July 21, 2017 that her case was still open .

93.  Rather than honor Plaintiff's request for dismissal, the Regional Director issued a finding of no probable cause, dismissing Plaintiff's charge and thereby precluding her from

raising her State law claims, disregarding her previous request for dismissal for administrative convenience.

### AS AND FOR A FIRST CAUSE OF ACTION FOR VIOLATION OF THE AGE DISCRIMINATION IN EMPLOYMENT ACT

94.   Plaintiff repeats, reiterates, and realleges , each of the allegations contained in Plaintiff's designated paragraphs "1" through  "93", as if more fully realleged and set forth at length herein.

95.   Plaintiff is 61 years of age and is  part of the protected class under theADEA  at the time of the adverse employment actions and retaliation.

96.   Plaintiff was discriminated against on account of her age, in violation of the ADEA.

97.   At all relevant times, Plaintiff  was an exemplary employee.

98. Defendants' actions of demoting Plaintiff and removing her from OB/GYN,  other than on a rotation, and  changing her work hours, and decreasing her pay, were pretextual and in violation of the ADEA.

99.   Defendants gave most of Plaintiff's assignments to younger employees.

100.     Plaintiff was referred to as an "old dog" by both  Defendants Russo and Chestnut Rauls.

101.     By reason of the foregoing violation of the ADEA,  the Plaintiff, MARY  COLLETTA,  sustained economic damages, including by not limited to lost wages and Benefits, and renumeration, and was rendered sick, and disabled, suffered and still suffers From great pain, mental anguish, nervous shock , all to her damage.   Plaintiff is also entitled to be compensated for reasonable costs, disbursements, and attorney's fees.

21

### AS AND FOR A SECOND CAUSE OF ACION FOR DISCRIMINATION BASED  UPON DISABILITY, IN VIOLATION OF THE ADA.

102.    Plaintiff repeats, reiterates and realleges, each of the allegations contained in Plaintiff's designated "1" through "101" paragraphs, as if more fully realleged and set forth at length herein.

103.    Plaintiff was within the protected class of the ADA, in that she had a documented has a disability.  Plaintiff advised her employer , defendant PBMC/NORTHWELL  of her disability in November, 2016 and requested an ADA meeting with Defendant Chestnut Rauls to discuss her request for a reasonable accommodation.

104.    Plaintiff was qualified for her position as evidenced from her previous evaluations and the many letters of support from Hosptial surgeons.

105.    Plaintiff was subjected to adverse employment actions within days of having requested an ADA accommodation, in that she was falsely accused of and disciplined for  taking excessive time In violation of the Hospital's policy;  she was falsely accused of cutting or performing surgery on a patient and she was removed from her assignment as "on call" OB/GYN specialist nurse.

106.    Plaintiff requested a reasonable accommodation and requested that Defendant s engage in an interactive process to identify an accommodation.

107.    Defendants refused to do so, and instead forced Plaintiff to take FMLA  leave against her wishes.

108.    Defendants violated Plaintiff's rights under the ADA, to receive a reasonable accommodation, upon request.

109.    By reason of the foregoing  violation of the ADA, plaintiff, MARY COLLETTA,

sustained economic loss, depletion of accrued sick leave, loss of benefits and remuneration and suffered and still suffers pain, mental anguish, nervous shock, hurt, humiliation, all to her damage.  Plaintiff is also entitled to be compensated for reasonable costs, disbursements, and attorneys' fees.

**AS AND FOR A THIRD CAUSE OF ACTION FOR HOSTILE WORK ENVIRONMENT UNDER THE ADA**

110.    Plaintiff  repeats, reiterates and realleges, each of the allegations contained in Plaintiff's designated "1" through "109" paragraphs, as if more fully realleged and set forth at length herein.

111.    On account of her documented disability, Plaintiff was subjected to continuous and concerted actions of harassment by her supervisor, Defendant Russo and by HR Vice President Defendant Chestnut Rauls.

112.    Plaintiff was subjected to discriminatory intimidation, ridicule and insult that was severe and pervasive.

113.    Plaintiff's work environment was altered in that she was the subject of regular unwarranted  disciplinary actions, subject to constant ridicule and was made to be the laughing stock of the OR, with staff referring  to her as being the "witch" concerning which Defendant Russo was on a witch hunt.

114.    Defendant Russo constantly monitored Plaintiff on a daily basis, assigning her the heaviest patient loads without sufficient help, pulling staff to ensure that Plaintiff did not receive adequate help.

115.    Plaintiff was treated less favorably than other nursing staff in the OR because of her disability and her need for medical treatments, being disciplined for taking documented

medical leave time  while other employees could take leave without issue for personal

reasons or family health issues.

116.    As a result of Defendants' actions, Plaintiff has sustained economic loss and

Suffered and continues to suffer hurt, humiliation and mental anguish.

**AS AND FOR A FOURTH  CAUSE OF ACTION FOR VIOLATION OF THE
FAMILY MEDICAL LEAVE ACT**

117.    Plaintiff repeats, reiterates and realleges, each of the allegations contained in

Plaintiff's designated "1" through  "116" paragraphs, as if more fully realleged and set forth at

length herein.

118.    Plaintiff is an eligible employee under the FMLA and was entitled to take

FMLA leave and requested said leave.

119.    Over a three month period, Plaintiff had six absentee occurrences under the

treatment of her cardiologist and had presented medical documentation to her employer.  Not

once did Defendant Russo or Defendant Chestnut Rauls advise Plaintiff that she could have

taken FMLA leave:  Instead, Plaintiff was written up for excessive absenteeism.  Defendant

Hospital  failed to put Plaintiff on notice as to her eligibility for leave under the

FMLA  because  her medical treatment appointments qualified for said leave.

120.    In calculating Plaintiff's leave which was used as the basis for the written

reprimand for excessive absenteeism, Defendant Hospital  wrongfully included time that was

actually subject to FMLA leave designation.

121.    Defendant Hospital wrongfully interfered with Plaintiff's

rights under the FMLA by denying her benefits to which she was entitled in terms of leave for

24

medical treatments.

122. Defendant Hospital  on behalf of defendant Hospital  also

retaliated against Plaintiff by issuing a written disciplinary action and threatening to terminate

her due to her  request for FMLA leave.

123. As a result of Defendant Hospital's  actions, plaintiff, MARY COLLETTA,

sustained economic damages,  suffers and continues to suffer  pain, mental anguish, nervous

shock,hurt, humiliation.

## AS AND FOR A FIFTH CAUSE OF ACTION PURSUAT TO 301 OF THE LABOR MANAGEMENT RELATIONS ACT

**124.** Plaintt repeats, reiterates and realleges, each of the allegations contained in

Plaintiff's designated  "1" through  124 " as if more fully realleged and set forth at length.

herein.

125. The employer violated the following provisions of the collective bargaining

agreement:

Reassignment

Failure to investigate

Anti-bullying

Excessive sick leave

Review of personnel file

126. Plaintiff requested that the union proceed with grievances regarding the Hospital's

violation of the collective bargaining agreement regarding its disciplinary actions

against Plaintiff without just cause.

25

127.    Defendant Union and Defendant Sherman led Plaintiff to believe that they were advocating on her behalf, acknowledging to her that they believed there were grounds to file grievances regarding the disciplinary actions taken against Plaintiff by Defendant Russo resulting in a change in Plaintiff's shift, a demotion, taking away Plaintiff's on call assignment, accusing Plaintiff of bullying and harassing staff without any proof thereof; accusing and disciplining Plaintiff for abusing sick time when she had submitted medial certifications.

128.    It was not until Defendant Hospital in its rebuttal to Plaintiff's NYSDHR charge responded that the union had dropped the grievances that Plaintiff became aware of  this assertion and immediately contacted Defendant union inquiring what was the status of her grievances.

129.    Finally, in response to Plaintiff's numerous emails, Defendant union, in July, 2017 advised Plaintiff that the grievances were not being pursued, but did not articulate a reason why, even though it had previously told Plaintiff that she had meritorious grievances.

130.    Defendant union acted  arbitrarily and in bad faith, misleading Plaintiff to believe that she had viable grievances, and that it was pursuing the grievances, but then failing to pursue the grievances and failing to notify her of its decision and the basis therefore.

131.    Upon information and belief the Defendant Union abandoned Plaintiff's grievances without her knowledge in order to ingratiate itself with the Hospital in an attempt to gain favor with the Hospital in the upcoming and ongoing contract negotiations resulting in Plaintiff's rights being sacrificed and she was prejudiced by the union failing to assert her valid grievances.

26

132.   As a result of Defendant Hospital and its agents Defendant Russo and Defendant Chestnut Rauls' actions in violation of the Hospital collective bargaining agreement and the Defendant Union's failure to pursue the grievances after it had told Plaintiff it would, Plaintiff has experienced  hurt,  and physical and emotional pain.

**AS AND FOR A SIXTH CAUSE OF ACTION  VIOLATION OF 14TH AMENDMENT , PURSUANT TO SECTION 1983  BAD FAITH AND ARBITRARY ACTION**

133.   Plaintiff  repeats and realleges each of the allegations contained in Plaintiff's designated "1" through "129" paragraphs in this complaint, as truly set forth herein.

134.   Defendant  Chungata  is a state actor

135.   Defendant Chungata  is the Regional Director for the New York State Division of Human Rights, the Long Island Regional Office in Hempstead, New York.

136.   Defendant  Chungata  failed to afford Plaintiff the same treatment as Defendant Hospital which was granted three extensions of time for submitting a rebuttal to Plaintiff's charge of discrimination filed with the Division on December 16, 2016,  and was permitted until May ,2017 to file its response.

137.   .Plaintiff requested one extension of time to submit her rebuttal to Defendants' untimely response and was denied.  Plaintiff had a valid and documented reason for her request for an extension of time in that she was ill and hospitalized, undergoing  a medical procedure.

138.   .As a result of the Defendant's denial  of an extension of time, Plaintiff was not allowed to rebut the lies which were set forth and wrongfully considered as truth by Defendant.

139.. As a result of Defendant Chungata 's  actions, Plaintiff was denied equal protection of the law in that she was discriminated against based upon her disability and because she engaged in protected activity.

140. As a result of Defendant Chungata's  actions, Plaintiff was denied her due process rights in that she was not afforded an opportunity to submit her rebuttal to the Defendants' position statements and was denied the opportunity to rebut their lies.

141.  Plaintiff was advised by the Division that her case was still open at which time Plaintiff made a request for dismissal for administrative convenience, as she had also contacted the EEOC for issuance of a Notice of Right to Sue Letter.

142.  Defendant Chungata  failed to honor that request and instead issued a finding of no probable cause.

142. As a result of Defendant Chungata's  actions, Plaintiff has been denied the opportunity to assert her claims under New York State Division of Human Rights Law and is precluded from raising claims against the individual Hospital defendants as aiders and abettors.

143.  As a result of Defendants' actions, Plaintiff has suffered a violation of her equal protection and due process rights and has experienced physical and emotion injury.


**AS AND FOR A SEVENTH  CAUSE OF ACTION FOR RETALIATION
PURSUANT TO NEW YORK STATE LABOR LAW SECTION 741**

144. Plaintiff repeats, reiterates and realleges each of the allegations contained in Plaintiff's  designated  "1" through "143" as more fully set forth herein.

145. On several  occasions , plaintiff disclosed to her supervisors and the CEO Mitchell

instances of improper/inadequate quality of patient care.

146. Plaintiff , in good faith, reasonably believed that these activities and practices constituted improper quality of  patient care.

147. Defendants were given a reasonable opportunity to correct such activities and practices but failed to do so.

148.The improper quality of patient care presented an imminent threat to public health and safety, as well as to specific patients.

149.Defendant Hospital retaliated against Plaintiff in violation of New York Labor Law Section 741 by permanently changing Plaintiff's shifts; reducing her on call hours; reducing her earnings; making her the subject of unwarranted disciplinary actions and negative evaluations; assigning her the heaviest work load; making her the subject of harassment and ridicule on a regular basis; threatening her with loss of her professional license by accusing her of cutting a patient.

## AS AND FOR AN EIGHTH CAUSE OF ACTION, NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

150. Plaintiff repeats , reiterates and realleges each and every allegation contained in Paragraphs "1" through "150"  of this Complaint with the same force and effect as though fully set forth herein.

151. Since her arrival at PBMC, defendant Russo began berating Plaintiff, threatening Plaintiff's employment " stating that it was her way or the highway.

29

152. Plaintiff alleges that the foregoing actions, conducted either intentionally, recklessly or in the alternative, negligently, resulted in severe emotional distress, and physical injury, causing Plaintiff great personal damage, mentally, emotionally, and physically.

153. As a direct result of said acts, Plaintiff has suffered and continues to suffer repeated and severe psychological, emotional and physical trauma and damage, including distress , humiliation, embarrassment, great financial loss and expense, damage to her reputation, emotional and physical trauma.

154. By reason of the foregoing, Plaintiff has been subjected to emotional damages, distress,,pain, suffering, loss of self esteem, exposure to disgrace and public humiliation, embarrassment, anxiety, and frustration and was prevented from attending to her work  and was damaged in the sum of Ten Million Dollars ($10,000,000.00)

## JURY DEMAND

The Plaintiff demands that the foregoing causes of action be tried before a jury.

WHEREFORE,  the Plaintiff, MARY COLLETTA,  demands judgment against the Defendants  as follows:

Count one Three Million Dollars as well as punitive damages;,

Count Two  Three Million Dollars, as well as punitive damages;

 Count Three  Three Million Dollars, as well as punitive damages;

Count Four Three Million Dollars , as well as punitive damages

Count Five Three Million Dollars . as well as punitive damages

Count Six Three Million Dollars, as well as punitive damages

Count Seven Three Million Dollars, as well as punitive damages

Count Eight Three Million Dollars as well as punitive damages together with costs, interest, attorneys fees, punitive damages and such other and further relief as this Court may seem just, equitable and proper.

Dated:  Riverhead, New York
       November 14, 2017

                     /s/ Harriet A. Gilliam
                     _____
                     Harriet A. Gilliam, Esq.
                     Attorney for Plaintiff
                     21 W. Second Street
                     Riverhead, NY  11901
                     (631) 369-1400

5417